UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHAUN M. ROBERTS,

        Petitioner,

                                CASE NO. 2:07-CV-13361
    v.                            JUDGE ROBERT H. CLELAND
                                MAGISTRATE JUDGE PAUL J. KOMIVES

KENNETH ROMANOWSKI,

        Respondent.

_____/

## REPORT AND RECOMMENDATION

*Table of Contents*

I.      RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . 4
      C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
      D.    *Sufficiency of the Evidence (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
           1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
           2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      E.    *Evidentiary Claims (Claims II & III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
           1.    *Testimony of the Victim (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
                 a. Competence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
                b. Cross-Examination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
           2.    *Victim's Hearsay Statements (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
      F.    *Ineffective Assistance of Counsel (Claims VI & VIII)* . . . . . . . . . . . . . . . . . . . . . . . . 18
           1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
           2.    *Trial Counsel (Claim VI)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
           3.    *Appellate Counsel (Claim VII)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
      G.    *Sentencing (Claims IV & V)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
           1.    *Guidelines Scoring & Departure* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
           2.    *Proportionality* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
           3.    *Blakely* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
      H.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of

habeas corpus.

II.     REPORT:

A.      *Procedural History*

        1.      Petitioner Shaun M. Roberts is a state prisoner, currently confined at the Bellamy

Creek Correctional Facility in Ionia, Michigan.

        2.      On August 15, 2002, petitioner was convicted of first degree criminal sexual conduct,

MICH. COMP. LAWS § 750.520b(1)(a), following a jury trial in the St. Joseph County Circuit Court.

On February 3, 2003, he was sentenced to a term of life imprisonment.

        3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through

counsel, the following claims:

        I.      THE PROSECUTION FAILED TO PRODUCE SUFFICIENT EVIDENCE
                AT TRIAL TO SUSTAIN A JURY VERDICT, OF GUILT BEYOND A
                REASONABLE DOUBT, ON THE CHARGE OF FIRST DEGREE
                CRIMINAL SEXUAL CONDUCT.

        II.     DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT OF
                CONFRONTATION WHERE HE WAS UNABLE TO CROSS-EXAMINE
                THE CHILD WITNESS TENISHA HOCHSTETLER AT TRIAL
                BECAUSE SHE WAS EMOTIONALLY DISTRAUGHT AND UNABLE
                TO VERBALLY COMMUNICATE AND WAS INCOMPETENT TO
                TESTIFY WHILE ON THE WITNESS STAND.  THE TRIAL COURT
                ABUSED ITS DISCRETION WHERE IT FAILED TO DETERMINE HER
                COMPETENCY TO TESTIFY AND IN FAILING TO GRANT
                DEFENDANT'S MOTION FOR A MISTRIAL.

        III.    THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN
                PERMITTING THE PROSECUTION'S EXPERT MEDICAL WITNESS,
                DR. COLETTE GUSHURST, TO TESTIFY TO THE HEARSAY
                STATEMENTS OF THE ALLEGED CHILD-VICTIM IDENTIFYING
                DEFENDANT AS THE PERPETRATOR.

        IV.     THE TRIAL COURT'S SCORING OF OFFENSE VARIABLES 10 (OV-

2

10) UNDER THE STATUTORY SENTENCING GUIDELINES WAS
CLEARLY ERRONEOUS WHERE IT IMPROPERLY ASSESSED AN
ADDITIONAL 10 POINTS INCREASING DEFENDANT'S OV LEVEL
FROM III TO IV.

V.     DEFENDANT'S SENTENCING PROCEEDING WAS TAINTED BY
       REVERSIBLE ERROR WHERE THE TRIAL COURT:

       A.     FAILED TO INDIVIDUALIZE DEFENDANT'S SENTENCE OR
              ARTICULATE SUBSTANTIAL AND COMPELLING REASONS
              BASED ON OBJECTIVE AND VERIFIABLE FACTORS FOR
              DEPARTURE FROM THE STATUTORY SENTENCING
              GUIDELINES RANGE AS REQUIRED BY STATUTE;

       B.     VIOLATED THE CONCEPT OF PROPORTIONALITY IN
              IMPOSING [A] LIFE IN PRISON SENTENCE FOR FIRST
              DEGREE CRIMINAL SEXUAL CONDUCT.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. Roberts*, No. 247217, 2004 WL 1837670 (Mich. Ct. App. Aug. 17, 2004) (per curiam).

4.     Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan

Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard

order.  *See People v. Roberts*, 472 Mich. 908, 696 N.W.2d 710 (2005).

5.     Petitioner subsequently filed a motion for relief from judgment in the trial court

pursuant to MICH. CT. R. 6.500-.508, raising the following claims:

I.     DEFENDANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO
       THE EFFECTIVE ASSISTANCE OF APPELLANT [sic] COUNSEL, AS
       A RESULT OF APPELLATE COUNSEL'S FAILURE TO RAISE THE
       ISSUES CITED IN ISSUE II IN DEFENDANT'S APPEAL OF RIGHT.

II.    DEFENDANT WAS DENIED HIS DUE PROCESS RIGHT TO THE
       EFFECTIVE ASSISTANCE OF TRIAL COUNSEL, UNDER THE
       FEDERAL AND STATE CONSTITUTIONS, BY TRIAL COUNSEL'S
       FAILURE TO (A) SUBJECT [] THE COMPLAINANT TO ANY CROSS-
       EXAMINATION WHATSOEVER, THEREBY FAILING TO PUT THE
       STATE'S CASE THROUGH [THE] ADVERSARIAL TESTING
       PROCESS, AND (B) THE CUMULATIVE EFFECTS OF TRIAL ERRORS

3

CAUSE[D] DEFENDANT UNCURABLE PREJUDICE, WHICH DENIED
DEFENDANT A FAIR TRIAL.

On February 17, 2006, the trial court denied petitioner's motion for relief from judgment. The

Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave

to appeal in standard orders, based on petitioner's "failure to meet the burden of establishing

entitlement to relief under MCR 6.508(D)." *People v. Roberts*, 478 Mich. 871, 731 N.W.2d 755

(2007); *People v. Roberts*, No. 271572 (Mich. Ct. App. May 30, 2007).

6.      Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus

on August 10, 2007. As grounds for the writ of habeas corpus, he raises the seven claims that he

raised in the state courts.

7.      Respondent filed his answer on February 25, 2008. He contends that petitioner's

claims are without merit, and that petitioner's ineffective assistance of counsel claims are barred by

petitioner's procedural default in the state courts.

B.      *Factual Background Underlying Petitioner's Conviction*

Petitioner was convicted in connection with the sexual assault of his three-year-old

stepdaughter between May 1998 and February 1999. The evidence adduced at trial was accurately

summarized in petitioner's brief in the Michigan Court of Appeals on direct appeal:

> The prosecutor called James Henry, Ph.D. (T1, 53), who testified that he was
> a professor at Western Michigan University and director of the Southwest Michigan
> Children's Trauma Assessment Center in Kalamazoo, specializing in sexual abuse
> and child trauma. He explained that he has assessed 600 cases of child sexual abuse,
> and was qualified as an expert (T1, 64-68).
> Dr. Henry stated that children 3-4 years old perceive their environment
> though adult caretakers, are at the very early point in differentiating between reality
> and what is truth or a lie fantasy and do not have a developed capacity for memory.
> The "baseline" truth and lies is four and strengthens around 5 or 6 even though they
> are susceptible to adult suggestion. The inability to communicate and confusion may
> account for delay in reporting sexual abuse.

4

Dr. Henry stated that children who suffer traumatic sexual abuse have imprinted the memory of the core event as the result of feeling powerlessness. Disclosure is a process over time and memory of the peripheral events may be sketchy. Core events will be recalled more specifically, but children will be inconsistent in disclosing over a period of time. Moreover a lot of things will be forgotten between the ages of 3-6 years old. They will remember "different" or out of the ordinary things that adults do to them, things that cause fear or trauma, and something that happens out of the ordinary to their body (T1, 69-74).

The witness described a process called "grooming" that is utilized by caregivers that amounts to gaining the child's trust, and over a period of time "they'll exceed boundaries of children's physical space on their body slowly to see what the child does with that." From there over time usually a series of things that slowly move forward to more involved touching occurs. If these acts take place over a long period of time "blurring" may take place that results in the inability to recall or separate out specific events, places or specific dates.

Dr. Henry stated that upwards of 70% of children in one study denied that any sexual abuse occurred when the topic was broached for the first time, and 95% of children under 5 years old initially deny that it happened and this would be increased where the perpetrator told them not to tell anyone about it.

Approximately 75% of children in that study engaged in "accidental disclosure." A hypothetical based on how Tanisha told her grandmother after she made a mess in her training pants and took her grandmother's hand to fondle herself, was scolded and said "why not, Shaun does that," was an example of spontaneous accidental disclosure. He indicated that it would not be unusual, depending on the circumstances that the child would deny that any abuse happened at a later date.

Dr. Henry indicated that pedophilia is where an adult is sexually attracted to children, and other individuals may be simply acting out their own experience of being abused when they were children and exerting power over their victim. He indicated that a child of three would be able to identify her perpetrator and describe that the abuse hurt (T1, 75-86).

Rhoda Hochstetler, (T1, 98), Tenisha's adoptive mother as of January 22, 2000, had been her foster mother from January of '97 until the end of May of '98, then again in February of 1999. She stated that Tenisha was born on June 12, 1995.

Tenisha Hochstetler, (T1, 102), was called to testify [and] stated she was 7 years old. When she was unable to testify a 40 minute recess was taken. After the recess and sitting on her mother's lap, [she] stated that Shaun "touched her in her privates," and was asked to point this out on a doll. She did not remember if []he put anything inside of her. The record is not clear if Tenisha was able to demonstrate with the dolls as to what happened to her.

Defendant made a motion for a mistrial based upon the emotionally distraught condition of Tenisha, that rendered her unable to answer any questions and prevented Defendant his right to cross-examination and confrontation. The trial court denied the motion (T1, 107-110).

Leneigh White, (T1, 110), a child psychologist and Director of Children's

5

Services at Horizon Diagnostic and Treatment Center, was qualified as an expert and indicated that she treated Tenisha Bordine (Hochstetler) in November of 1998. Her maternal grandmother, Judy Bordine brought her in reporting that Tenisha told her that Shaun had "rubbed her with his butt." When she was taken to the police, Tenisha didn't say anything, but continued to tell her grandmother about this, which prompted her grandmother to bring her in to see her. Tenisha was also having trouble sleeping. She was crying out in her sleep, telling her grandmother that she didn't want to go back home and that she wanted to stay with her grandmother. Her preliminary diagnosis was sexual abuse of a child.

She observed Tenisha's reaction to Shaun who was unexpectedly in the waiting room after a counseling session stating that she "jumped. . . . Her whole demeanor changed. Her face just dropped. She went pale." The next session, December 22, 1998, she disclosed by demonstrating penile-vaginal intercourse with dolls, and stated that Shaun [had] done this to her "lots of times." A couple of sessions later on February 17, 1999, after she had been removed to foster care, Tenisha stated that "Shaun would lick my butt, make me lick his," which she demonstrated as oral sex. Ms. White treated Tenisha for anxiety. There was a delay in prosecuting this matter because of her age and her "ability to clearly testify." (T1, 111-129).

Ms. Bordine did not tell the witness that Tenisha had been examined by a physician at the Three Rivers emergency room a few months earlier, after they had gone to the police and FIA, but that the examination revealed no evidence of sexual abuse. Ms. White conceded that some of the anxiety that Tenisha was experiencing could be from the inconsistent home life where she was moved frequently and had different caregivers.

Tenisha's grandmother reported that when she was watching a movie, Tenisha informed her that Ryan, Shaun's brother, had also licked her bottom and that she disclosed to Ms. White that Ryan "had touched her butt in the barn." She reported these disclosures about both Ryan and Shaun to the authorities and Tenisha was removed from her mother's custody in late January of 1999 (T1, 130-144).

Defendant's motion for exclusion of the hearsay statements made to Doctor Colleen [sic] Gushurst, a prosecution expert was denied (T1, 144-160; T2, 4; T3, 53-56).

Colette Gushurt, M.D., (T2, 5), a pediatrician at Michigan Stat e University, Kalamazoo Center for Medical Studies, was qualified as an expert in the area of child abuse and neglect [and] testified that she examined then 4 year old Tenisha Bordine on July 2, 1999, on a referral from FIA for suspected penile/genital contact and oral sexual contact with the alleged perpetrator, Shaun Roberts. Her examination revealed a "healed disruption" [of the hymen] which she placed as 3 on a 5 scale indicating subtle abnormalities that she termed "suspicious for penetrating trauma." She questioned Tenisha who stated Shaun "rubbed her there" and by touching on various parts of her anatomy. When she "separated the labia majora and put the culturette on the inside of the labia majora, on the inside of the labia majora, but also right closer on the outside of the hymen, and I asked her if she felt him rubbing her

there, and she said yes." When she asked her if she felt anything deeper than that, she said, "Yes, deeper," and she actually added a word, "inside."

Dr. Gushurst indicated that it is impossible for a perpetrator to touch her there without penetrating the labia. Dr. Gushurst was not aware that there had been a previous medical examination that resulted in a finding of no trauma (T2, 6-28). The doctor indicated that the kind of disruption she noted in Tenisha does [not] exclusively result from penetration of the labia majora, but that it would come from direct hymenal trauma. In addition to sexual penetration it could be attributable to rollerblading injuries, water skiing injuries, falling on a bicycle, on a fence post, etc., and that there was no way of knowing when it occurred (T2, 34, 36).

The people rested and Defendant['s] motion for directed verdict of acquittal was denied by the court (T2, 36-37).

The defense called Judy Bordine, (T2, 38), who was Tenisha's grandmother and the mother of Tenisha's mother Jennifer Bordine Roberts. She described that various changes in residence and custody that Tenisha experienced moving "up north" and back, in foster care, with her and with Jennifer and Shaun, who had other children together. She described when Tenisha told her about "somebody rubbing her." She took out the encyclopedia and Tenisha pointed to the penis. She took Tenisha to the hospital where she was examined by a doctor who told her that there was no penetration. She followed up with a contact with FIA and the police then with counseling. She stated that Tenisha told her that Ryan and Shaun had touched or rubbed her but that her initial disclosure was about Shaun only. When Jennifer doubted Tenisha's story, Tenisha again pointed to the penis and said Shaun touched her with that (T2, 39-58).

The defense played three video-tapes to the jury, the first a video-deposition of Dr. Brian Bowditch, the first examining physician who found no evidence of penetration trauma in Tenisha, (Defendant's Exhibit #1). The second was a video tape interview done on September 8th, 1998, with Sheila Schill from the Family Independence Agency interviewing Tenisha who simply played with the anatomically correct dolls and made no disclosure of any sexual contact (Defendant's Exhibit #2), and a third video taken on February 8th of 1999, of an interview of Tenisha by Sheila Schill (Defendant's Exhibit #3), taken after the December disclosure to psychologist White in which Tenisha undressed the dolls and demonstrates sexual contact (T2, 60-63).

Jennifer Roberts (T2, 64), Defendant's wife, and mother of Tenisha Bordine Hochstetler, stated that she had three children with Defendant, Damien Roberts, four, Seth Roberts, two, and Kane Roberts, one year old. She stated that in May of 1998, she was living with her mother and apart from Defendant. Tenisha went into foster care for the previous 1½ years. She moved back in with Shaun in July of 1998 at his mother, Ann Hawkins' house for two months. In July or August her mother, Judy Bordine took Tenisha for the weekend but did not return her. They moved back to Constantine, then in October back to her mother's with the kids. After a month she moved back to Carol Roberts' house in Constantine. In January of 1999, Tenisha was taken from her custody permanently by FIA. When they live[d] up north Shaun

worked long hours.  She thought the allegations of sexual abuse by Shaun were untrue and that the matter was over when the doctor found no evidence of penetration (T2, 65-79).

Carol Roberts, (T2, 82), Defendant's grandmother, had Jenny, Shaun, Damien, and Tenisha move in with her in 1998.  Both Shaun and Jenny worked while they lived with her.  Ryan lived with her other daughter and did not come to her home.

Shaun Roberts, (T2, 90), Defendant, testified on his own behalf, stated he was not living with his wife when their first child was born, but she moved up with him at his mom and stepfather's house in Lennon.  He worked from 6:00 a.m. until 10:00 p.m. at Dale's Cartage doing construction cleanup.  They moved back to his grandmother's house when his mother and her husband were in the process of splitting up.  FIA took his children in January of 1999.  Defendant denied any penetration of any kind or rubbing on Tenisha, either with his hand or penis or in her vaginal area.  He stated he did not even give her a bath.  His parental rights were terminated as to Tenisha and Damien.  His brother Ryan was not charged in this case.  Defendant denied that he was physically or emotionally abused when he was a child although his brother Ryan was (T2, 91-100).  After Judy Bordine testified that she had recently picked up a medical report from the hospital and read it for the first time, the defense rested (T2, 102).

The prosecution called Leroy A. Hochstetler, (T2, 102) Tenisha's adoptive father in rebuttal.  He testified that when Tenisha returned to his home the second time she placed her hand on my penis and rubbed it "and I just told her that – that she did not need to do that, and I still loved her, and that she didn't have to do those things."

Rhoda Hochstetler, (T2, 104), stated that in 1999 Tenisha had nightmares . . . of purple monsters, and she referred to them as Shaun.  She awakened her by calling out and while still sleeping was thrusting her hips and pelvis area in a sexual manner.  One day at a gas station . . . Tenisha screamed hysterically to leave after she saw Shaun there (T2, 105-107).

Def.-Appellant's Br. on Appeal, in *People v. Roberts*, No. 247217 (Mich. Ct. App.), at 1-8.

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of

whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.     *Sufficiency of the Evidence (Claim I)*

Petitioner first contends that the prosecution presented insufficient evidence to prove his guilt beyond a reasonable doubt. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

10

1.      *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970).  Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Reviewing courts must view the evidence, draw inferences, and resolve conflicting inferences from the record in favor of the prosecution.  *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992).  In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).

However, under the amended version § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision.  Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S. at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case."  *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691

(1975).  Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

Under Michigan law, criminal sexual conduct in the first degree is defined as follows: "A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and if any of the following circumstances exists:  (a) That other person is under 13 years of age."  MICH. COMP. LAWS § 750.520b(1)(a).  Thus, to be convicted of CSC-I the evidence must show that petitioner's victim was under 13 years of age and that he engaged in an act of sexual penetration with her.  Further, under the Michigan law, "'[s]exual penetration'" means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required.'  MICH. COMP. LAWS § 750.520a(o).

2.    *Analysis*

Petitioner contends that there was insufficient evidence of penetration because the victim, who was three years old at the time of the sexual assault, could not remember whether petitioner placed anything "inside her."  The Michigan Court of Appeals rejected this claim, reasoning that the victim's testimony that petitioner had touched her "in [her] privates," coupled with her descriptions of the sexual conduct to White and Dr. Gushurst and the evidence of injury to her hymen, provided sufficient evidence from which the jury could conclude beyond a reasonable doubt that petitioner had penetrated the victim.  The Court should conclude that this determination was reasonable.

At trial, when asked by the prosecutor whether petitioner "put anything inside your private," the victim responded that she could not remember.  *See* Trial Tr., Vol. I, at 105.  However, despite this testimony the victim earlier testified that petitioner had touched her "*in* my privates," *id.* at 104

12

(emphasis added), suggesting penetration.  Further, the victim demonstrated sexual intercourse to White using anatomically correct dolls, *see id*. at 122-23, and also described acts of fellation and cunnilingus to White, both of which would constitute penetration under the CSC-I statute, *see id*. at 125.  The victim also told Dr. Gushurst that petitioner had touched her inside her labia majora, and had touched her "inside" and "deeper."  *See id*., Vol. II, at 19-20.  Finally, the victim had an injury to her hymen which was consistent with a penetrating type injury.  *See id*. at 23-24.

Viewing this evidence in the light most favorable to the prosecution, a rational jury could have concluded beyond a reasonable doubt that petitioner penetrated the victim, notwithstanding her inability at trial to recall whether petitioner had done so.  Even apart from the testimony of White and Gushurst regarding the victim's statements to them, the victim's testimony that petitioner had touched her "in my privates" coupled with the medical evidence of injury to the victim's hymen was sufficient to support petitioner's conviction.  *See Strickland v. Pitcher*, 162 Fed. Appx. 511, 516-17 (6th Cir. 2006); *Bower v. Curtis*, 118 Fed. Appx. 901, 905-06 (6th Cir. 2004).  This is so even though Dr. Gushurst could not definitively testify that the injury to the victim's hymen was the result of sexual penetration.  On review of a sufficiency of the evidence claim, the evidence must be viewed in the light most favorable to the prosecution, and the prosecution is not required to rule out every hypothesis except that of guilt.  *See Jackson*, 443 U.S. at 326.  Petitioner's argument that the fact that Dr. Gushurst could not link the victim's injuries to him or to sexual penetration renders the evidence insufficient "requires looking at the medical testimony in isolation. Viewing the evidence in the light most favorable to the prosecution, the medical testimony establishes that [the victim] was penetrated at some point, and [the victim's] testimony provides the link that [petitioner] argues is missing-the source of the injury."  *Strickland*, 162 Fed. Appx. at 517.

Accordingly, the Court should conclude that the prosecution presented sufficient evidence to prove beyond a reasonable doubt that petitioner penetrated the victim, and thus that petitioner is not entitled to habeas relief on this claim.

E.     *Evidentiary Claims (Claims II & III)*

Petitioner next raises several challenges to the evidence admitted against him at trial.  First, petitioner argues that the victim was not competent to testify.  Second, he argues that because the victim was emotionally unable to testify, he was denied his right to confront her.  Finally, he contends that he was denied his right of confrontation by the testimony of White and Dr. Gushurst regarding the victim's hearsay statements.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.     *Testimony of the Victim (Claim II)*

Petitioner first contends that the child victim was not competent to testify, and that he was denied his right to cross-examine her because she was emotionally unable to continue with her testimony.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

a. Competence

Regarding the victim's competence, petitioner cannot establish an underlying constitutional violation relating to the competence of the victim.  Unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude.  *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987).  "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial,

14

unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994); *see also, Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process).

Thus, in reviewing petitioner's claim, this Court's "role is properly fulfilled by examining not whether [the victim] was a competent witness under state law, but whether her testimony was so grossly unreliable that, viewed in the context of the entire trial, it infected and fatally undermined the reliability of [petitioner's] conviction." *Peters v. Whitley*, 942 F.2d 937, 940 (5th Cir. 1991); *see also*, *Underwood v. Mueller*, No. C-95-2015-VRW, 1999 WL 111894, at *2 (N.D. Cal. Feb. 26, 1999) (competence of a witness is a question of state law not cognizable on habeas review).

Here, petitioner cannot show that the victim's testimony was so unreliable that it denied him a fair trial. As the Michigan Court of Appeals explained in rejecting petitioner's claim, "[t]he victim, who was seven years old at the time of her testimony, responded affirmatively when the trial court asked if she was going to tell what she knew and promised to tell the truth." *Roberts*, 2004 WL 1837670, at *3, slip op. at 3. Petitioner has not pointed to anything in the record suggesting that the victim did not "have sufficient physical or mental capacity or sense of obligation to testify truthfully and understandably" so as to render her incompetent. MICH. R. EVID. 601. Rather, petitioner points to the fact that the victim had difficulty testifying and required a long recess prior to the start of her testimony. As the court of appeals explained, however, these facts went to the

15

victim's credibility, not her competence to testify. *See Roberts*, 2004 WL 1837670, at *3, slip op. at 3. Petitioner has offered nothing to rebut the state courts' conclusion that the victim was competent to testify. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. *Cross-Examination*

Petitioner next contends that he was denied his Sixth Amendment right to confront the witnesses because the victim was unable to proceed with cross-examination. However, the record does not support petitioner's argument, but instead shows that counsel made a tactical decision not to cross-examine the victim.

At the start of her testimony, the victim did not answer some preliminary questions, and the court took a 40 minute recess to allow the victim to compose herself. *See* Trial Tr., Vol. I, at 102-03. After the recess, the victim sat on her adopted mother's lap and, although at times reluctant, was able to answer the questions posed to her by the prosecutor. *See id*. at 104-05. The prosecutor then stated, "I'm going to release Tenisha for cross-examination now." *Id*. at 105. Defense counsel immediately indicated, "I don't have any questions." *Id*. at 105. After the victim was excused, defense counsel moved for a mistrial, but not on the basis that she was unable to cross-examine the victim. Rather, counsel argued that the emotional distress evident in the victim rendered it impossible for petitioner to receive a fair trial before the jury. *See id*. at 106-07. In response, the prosecutor did address the cross-examination issue, arguing that despite her reluctance, the victim "did testify, and she did calm down after awhile." *See id*. at 107. The prosecutor also noted that despite counsel's decision not to cross-examine the victim at that time, the victim "would be available after she settles down again for that cross-examination." *Id*. The trial court denied the

16

motion for mistrial, but gave the jury a cautionary instruction that the jury should not be swayed by emotion and should decide the case solely on the evidence and received assurance from the jurors that they could make an objective decision based on the evidence.  *See id*. at 108-09.

Thus, the record fails to establish that petitioner was unable to cross-examine the victim. Although it was obviously difficult for her, the victim was able to testify on direct examination. Counsel did not attempt to cross-examine the victim only to have her break down or be unresponsive, but chose to decline to cross-examine her at all, apparently for tactical reasons. Because counsel did not attempt to cross-examine the victim and the record otherwise fails to establish that she was completely unable to respond to cross-examination questions, the Michigan Court of Appeals's determination that petitioner had waived this issue, *see Roberts*, 2004 WL 1837670, at *2, slip op. at 2, was reasonable.  "The Sixth Amendment right of confrontation is a personal right, which can be, and in this case was, waived by voluntarily agreeing not to cross-examine a witness at trial.  The right of confrontation is not denied simply because the prosecution is able to examine a witness whom for tactical reasons the defense declines to cross-examine." *Cruz v. Scully*, 716 F. Supp. 766, 770 (S.D.N.Y. 1989) (citations omitted); *see also*, *Bullock v. Carver*, 297 F.3d 1036, 1057 (10th Cir. 2002) (failure to cross-examine constitutes waiver of confrontation right).  Where counsel, in the defendant's presence and without objection from the defendant, chooses for tactical or strategic reasons to forego cross-examination the defendant will be deemed to have waived his confrontation rights.  *See Hawkins v. Hannigan*, 185 F.3d 1146, 1155 & n.5 (10th Cir. 1999); *United States v. Plitman*, 194 F.3d 59, 64 (2d Cir. 1999); *Lovett v. Foltz*, 687 F. Supp. 1126, 1134 (E.D. Mich. 1988) (Cook, J.), *aff'd*, 884 F.2d 579 (6th Cir. 1989).  A defendant's claim in such a case is limited to a claim that counsel was ineffective for choosing to

17

forego cross-examination.  *See Plitman*, 194 F.3d at 64.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

2.    *Victim's Hearsay Statements (Claim III)*

Petitioner also contends that he was denied his right to confront the victim because the prosecution introduced her hearsay statements.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Although the introduction of testimonial hearsay statements may violate the Confrontation Clause, *see Crawford v. Washington*, 541 U.S. 36, 59 (2004), there is no Confrontation Clause violation where the declarant of the out-of-court statement is available for cross-examination at trial.  As the Supreme Court has explained, "where the declarant is not absent, but is present to testify and to submit to cross examination, our cases, if anything, support the conclusion that the admission of his out of court statements does not create a confrontation clause problem."  *California v. Green*, 399 U.S. 149, 162 (1970); *see also*, *Crawford*, 541 U.S. at 59 n.9 ("[W]e reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. . . . The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it.").  Thus, where a declarant's out-of-court statement is admitted, the question is whether defendant has the *opportunity* to cross-examine the declarant at trial.  *See United States v. Spotted War Bonnett*, 933 F.2d 1471, 1474 (8th Cir. 1991); *cf. Bugh v. Mitchell*, 329 F.3d 496, 509 (6th Cir. 2003).  Here, as explained above, petitioner had the opportunity to cross-examine the victim at trial but counsel, for strategic reasons, chose not to do so.  Because petitioner had the opportunity to cross-examine the victim,

there was no Confrontation Clause violation by the introduction of her hearsay statements. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Ineffective Assistance of Counsel (Claims VI & VIII)*

Petitioner next contends that his trial counsel rendered constitutionally ineffective assistance at trial by failing to cross-examine the victim. He also contends that appellate counsel was ineffective for failing to raise this claim on direct appeal. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.    *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *See id*. at 687. These two components are mixed  questions of law and fact. *See id*. at 698.  Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.  If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.*  at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).  "[Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial

19

strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong of the *Strickland* test, the ultimate inquiry is "whether there is a reasonable probability that, absent [counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

### 2.   *Trial Counsel (Claim VI)*

Petitioner contends that counsel was ineffective for failing to cross-examine the victim. The court should disagree, because counsel's decision was a reasonable strategic decision.[1]

Counsel mounted a vigorous defense on petitioner's behalf, extensively and effectively cross-examining the prosecution's witnesses regarding the content, accuracy, and reliability of the victim's statements, her injuries, and the suggestiveness of their procedures. During a thorough closing argument, counsel highlighted the facts that the victim had repeatedly denied being sexually assaulted in various interviews; lived with petitioner for only a short period of time; and had also accused petitioner's brother but the brother had not been investigated. She also highlighted that

---

[1]Respondent contends that petitioner's claim is barred by his procedural default in failing to raise the claim on direct appeal. Even were the Court to conclude that petitioner's claim is procedurally defaulted, it is still necessary to consider the claim on the merits. Petitioner can still have his defaulted claim reviewed on the merits if he can show cause for, and prejudice attributable to, his default in the state courts. Petitioner contends that his appellate counsel was ineffective for failing to raise this claim on direct appeal. If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate that appellate counsel was ineffective petitioner must show, *inter alia*, that his claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's purportedly defaulted claim, it is better to simply consider the merits of these claims, even if they are defaulted. *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).

there was a dispute in the medical evidence with respect to whether the victim's hymen had been injured at all, and noted that the victim had not testified to any penetration. Within the context of this vigorous defense, there was little to be gained from cross-examining the young victim, who was only three years old at the time of the crime. It was apparent from her testimony that she lacked the recall or willingness to provide great detail concerning the sexual assault. Thus, it is unlikely that cross-examination would have elicited any useful information, particularly in light of the fact that the victim had denied that penetration had occurred during her direct examination. On the other hand, cross-examining the victim carried a substantial risk that the jury would view counsel negatively and sympathize with the victim.

Cross-examination of young "rape victims is a particularly delicate matter of trial strategy." *Santos v. Greiner*, No. 99 Civ. 1545, 1999 WL 756473, at *9 (S.D.N.Y. Sept. 24, 1999); *see also*, *Gillette v. Tansy*, 17 F.3d 308, 312 (10th Cir. 1994) (noting that "cross-examination of the young victim in this case, who was fifteen at the time of trial, was a very delicate and difficult matter."); *Bruns v. Thalacker*, 973 F.2d 625, 630 (8th Cir. 1992); *Kelly v. Ylst*, No. 88-5954, 1990 WL 42235, at *1 (9th Cir. Apr. 11, 1990) (counsel not ineffective for failing to cross-examine young rape victim where "it would have created a specter of counsel badgering a young child."); *cf. Bergmann v. McCaughtry*, 65 F.3d 1372, 1379-80 (7th Cir. 1995) (counsel not ineffective for failing to engage in cross-examination which would have engendered sympathy for the victim). Given the age of the victim at both the time of the crime and the time of the trial, the limited nature of her direct examination testimony, and the vigorous defense that counsel otherwise presented, it cannot be said that counsel's decision to forego cross-examination of the victim was anything other than a reasonable strategic decision. Accordingly, the Court should conclude that petitioner is not

21

entitled to habeas relief on this claim.

### 3.   Appellate Counsel (Claim VII)

Petitioner also contends that appellate counsel was ineffective for failing to raise his ineffective assistance of trial counsel claim on direct appeal. In the appellate counsel context, a showing of prejudice requires a showing that petitioner's claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). As explained above, petitioner's ineffective assistance of trial counsel claim is without merit, and thus petitioner cannot show that appellate counsel was ineffective for failing to raise this claim on direct appeal. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### G.   Sentencing (Claims IV & V)

Finally, petitioner raises a number of challenges to his sentence. First, he contends that the trial court erred in scoring his guidelines, departing upward from the guidelines, and failing to individualize his sentence. Second, he contends that his sentence was disproportionate to his offense and thus constitutes cruel and unusual punishment. Finally, he contends that the trial court's factual findings at sentencing violated his Sixth Amendment right to a jury determination of the facts establishing guilt. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

### 1.   Guidelines Scoring & Departure

A habeas petitioner's claim that the trial court violated state law when sentencing him is not cognizable in habeas corpus proceedings. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir. 1987). Federal habeas courts have no authority

to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Department of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). Petitioner's claim that the court improperly scored or departed from the guidelines range raises issues of state law that are not cognizable on habeas review. *See Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (Gadola, J.) (claim that sentencing court departed from Michigan sentencing guidelines presents an issue of state law only and is, thus, not cognizable in federal habeas review); *Welch v. Burke*, 49 F. Supp. 2d 992, 1009 (E.D. Mich. 1999) (Cleland, J.) (same); *see also, Branan*, 851 F.2d at 1508 (claim that court misapplied state sentencing guidelines not cognizable on habeas review).

Likewise, petitioner's claim that the trial court failed to impose an individualized sentence does not state a constitutional claim cognizable on habeas review. Although the Supreme Court has held that individualized sentencing is required in the death penalty context, *see, e.g.*, *Tuilaepa v. California*, 512 U.S. 967, 972 (1994); *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), these cases "have repeatedly suggested that there is no comparable requirement outside the capital context, because of the qualitative difference between death and all other penalties." *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) (citing *Eddings v. Oklahoma*, 455 U.S. 104, 110-112 (1982); *Rummel v. Estelle*, 445 U.S. 263, 272 (1980); *Lockett v. Ohio*, 438 U.S. 586, 602-05 (1978); *Woodson*, 428 U.S. at 303-05). Based on these cases, the *Harmelin* Court explicitly declined to extend the individualized sentencing requirement to non-capital cases. *Harmelin*, 501 U.S. at 996 ("We have drawn the line or required individualized sentencing at capital cases, and see no basis for extending it further."); *see also*, *id.* at 1006 (Kennedy, J., concurring). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on these

23

claims.

    2.    *Proportionality*

Petitioner next argues that his sentence is disproportionate to his offense. To the extent that petitioner relies on the Michigan proportionality rule established in *People v. Milbourn*, 435 Mich. 630, 461 N.W.2d 1 (1990), his claim is solely one of state law which is not cognizable on federal habeas review. *See Welch v. Burke*, 49 F. Supp. 2d 992, 1009 (E.D. Mich. 1999) (Cleland, J.). To the extent petitioner claims that his sentence violates the Eighth Amendment, the claim is without merit.

In *Solem v. Helm*, 463 U.S. 277 (1983), the Supreme Court held that the Eighth Amendment requires that "a criminal sentence be proportionate to the crime for which the defendant has been convicted." *Id.* at 290. In considering whether a sentence is proportionate, the Court identified three objective factors which are relevant: "(I) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for the same crime in other jurisdictions." *Id*. at 292. Applying this test to the facts before it, the Court found that the defendant's sentence of life imprisonment without possibility of parole under a habitual offender statute was disproportionate where the three underlying felonies were nonviolent crimes involving small sums of money, the final felony being for uttering a false check. *See id.* at 303.

However, the reach of *Solem* has been limited by the Supreme Court's more recent decisions. In *Harmelin v. Michigan*, 501 U.S. 957 (1991), the Court held that Michigan's mandatory sentence of life imprisonment for possession of over 650 grams of a controlled substance did not violate the Eighth Amendment. Justice Scalia, joined by Chief Justice Rehnquist, reasoned that *Solem* was

24

wrongly decided and should be overruled, and concluded that the Eighth Amendment contains no proportionality requirement outside the capital punishment context. *See Harmelin*, 501 U.S. at 965 (Scalia, J.). Justice Kennedy, joined by Justices O'Connor and Souter, concluded that the Eighth Amendment contains a very narrow proportionality principle, which prohibits only those punishments which are 'grossly' disproportionate to the crime. *See id*. at 1001 (Kennedy, J.). Further, Justice Kennedy's opinion distinguished *Solem*, essentially limiting application of the *Solem* objective criteria test to the facts in that case. *See id.* at 1001-05. Specifically, Justice Kennedy concluded that the objective analysis required in *Solem* is "appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Id*. at 1005-06.[2] Thus, it is unclear whether, and to what extent, *Solem* remains good law. *See McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992) ("By applying a head-count analysis, we find that seven members of the Court supported a continued Eighth Amendment guaranty against disproportional sentences. Only four justices, however, supported the continued application of all three factors in *Solem*, and five justices rejected it. Thus, this much is clear: disproportionality survives; *Solem* does not.").

As the Sixth Circuit has summarized, under *Harmelin*, "although only two Justices [Rehnquist and Scalia] would have held that the eighth amendment has no proportionality requirement, five Justices [Kennedy, O'Connor, and Souter, along with Rehnquist and Scalia] agree that there is no requirement of strict proportionality." *United States v. Hopper*, 941 F.2d 419, 422 (6th Cir. 1991). At most, then, the Eighth Amendment "forbids only extreme sentences that are

---

[2] Justices White, Blackmun, Stevens, and Marshall all concluded that *Solem* should be upheld, and the three factor test applied to the sentencing scheme at issue. *See Harmelin*, 501 U.S. at 1016 (White, J., dissenting).

'grossly disproportionate' to the crime." *Harmelin*, 501 U.S. at 1001; *Hopper*, 941 F.2d at 422 ("the eighth amendment is offended only by an extreme disparity between crime and sentence").  Thus, as a general matter, "one could argue without fear of contradiction by any decision of the [Supreme] Court that for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of sentence actually imposed is purely a matter of legislative prerogative."  *Rummel v. Estelle*, 445 U.S. 263, 274 (1980); *see Harmelin*, 501 U.S. at 962-65 (Scalia, J.); *id.* at 997-1001 (Kennedy, J.)

More recently, the Supreme Court again considered the proportionality issue under the Eighth Amendment, resulting in a split similar to that reached in *Harmelin*. In *Ewing v. California*, 538 U.S. 11 (2003), a three-justice plurality reaffirmed Justice Kennedy's approach in *Harmelin*, concluding that the Eighth Amendment contains a narrow proportionality principle which forbids sentences which are grossly disproportionate to the offense. *See id.* at 23-24 (opinion of O'Connor, J.) Justice O'Connor was joined in this position by Justice Kennedy, who had authored the plurality opinion in *Harmelin*, and by Chief Justice Rehnquist, who in *Harmelin* had joined Justice Scalia in concluding that the Eighth Amendment contains no proportionality requirement outside of the capital sentencing context. Justice Scalia, now joined by Justice Thomas (who was not on the Court when *Harmelin* was decided), reaffirmed his view that the Eighth Amendment contains no proportionality guaranty. *See id.* at 32 (opinion of Scalia, J.); *id.* at 32 (opinion of Thomas, J.). Justice Stevens likewise reaffirmed his view from *Harmelin* that the three-factor test of *Solem* guides the proportionality inquiry under the Eighth Amendment. Justice Stevens was joined in this view by Justice Souter, who had joined the plurality opinion of Justice Kennedy in *Harmelin*, as well as by Justices Ginsburg and Breyer, who were not on the Court when *Harmelin* was decided. *See id.*

26

at 33-35 (opinion of Stevens, J.); *id.* at 36-37 (opinion of Breyer, J.). Thus, although the particular Justices attached to each position have changed somewhat, the numbers and rationales in *Ewing* break down precisely as they did in *Harmelin*. Thus, for purposes of habeas review, the Sixth Circuit's analysis of *Harmelin*, in which this Court asks only whether the sentence is grossly disproportionate to the offense, *see Coleman v. DeWitt*, 282 F.3d 908, 915 (6th Cir. 2002); *United States v. Baker*, 197 F.3d 211, 217 (6th Cir. 1999), remains controlling under *Ewing*.

Here, the *Harmelin* plurality's "threshold comparison" of petitioner's crime and the sentence imposed, does not "lead to an inference of gross disproportionality," *Harmelin*, 501 U.S. at 1005, and thus the Court should conclude that petitioner is not entitled to habeas relief on this ground. Petitioner was convicted of sexual assault involving penetration of his three-year old stepdaughter, under a statute authorizing up to life imprisonment. *See Howard v. Campbell*, No. 1:06-CV-1818, 2008 WL 4952568, at *12 (E.D. Cal. Nov. 18, 2008); *Servis v. Quarterman*, No. 4:07-CV-426-A, 2008 WL 4787637, at *4 (N.D. Tex. Oct. 24, 2008); *cf. United States v. Polk*, 508 F. Supp. 2d 89, 97-98 (D. Me. 2007) (citing cases in which several sentences have been imposed following conviction under the federal child pornography statute). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

3.    *Blakely*

Finally, petitioner contends that his sentence violates the rule of *Blakely v. Washington*, 542 U.S. 296 (2004) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In *Apprendi*, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. In *Blakely*, the Court considered the applicability of *Apprendi* to a state

sentencing guidelines scheme similar to the United States Sentencing Guidelines.  The state in that

case argued that guidelines findings were not prohibited by *Apprendi* because *Apprendi* prohibited

only factual findings at sentencing which increased the statutory maximum penalty to which the

defendant was exposed.  The Court in *Blakely* rejected this argument and struck down the state

guidelines scheme, explaining that:

> the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge
> may impose *solely on the basis of the facts reflected in the jury verdict or admitted
> by the defendant.*  In other words, the relevant "statutory maximum" is not the
> maximum sentence a judge may impose after finding additional facts, but the
> maximum he may impose *without* any additional findings. When a judge inflicts
> punishment that the jury's verdict alone does not allow, the jury has not found all the
> facts "which the law makes essential to the punishment," and the judge exceeds his
> proper authority.

*Blakely*, 542 U.S. at 303-04 (citations omitted) (emphasis in original).

Finally, in *United States v. Booker*, 543 U.S. 220 (2005), the Court took the step logically

suggested by *Blakely*, concluding that the United States Sentencing Guidelines are unconstitutional

under *Apprendi* because they allow federal judges to impose sentences based on facts not found by

a jury beyond a reasonable doubt.  Two separate majorities formed the Court's decision.  Justice

Stevens delivered the opinion of the Court on the substantive question of whether the Guidelines are

unconstitutional under *Apprendi*.  Noting that there was no difference of constitutional significance

between the Guidelines and the state guideline system at issue in *Blakely*, *see Booker*, 543 U.S. at

233, and rejecting the government's attempts to distinguish the two, *see id*. at 237-43, the merits

majority concluded that the Guidelines violate the Sixth Amendment as interpreted in *Apprendi*.

A separate majority joined an opinion authored by Justice Breyer, which contained the Court's

decision on the remedial issue.  The remedial majority concluded that the appropriate remedy for

the constitutional violation was not to strike the Guidelines in their entirety, but to excise two

statutory provisions which make the Guidelines mandatory.  *See id*. at 245.  Thus, under *Booker* the Guidelines remain advisory, and a federal district judge must consult the Guidelines before imposing sentence, but the judge is not bound to follow the Guidelines.

Petitioner contends that, because the trial court made the necessary findings on the sentencing guidelines, his sentence violates *Blakely* and *Apprendi*.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.  Michigan law provides for an indeterminate sentencing scheme, unlike the determinate sentencing schemes at issue in *Blakely* and *Booker*. Under Michigan law the defendant is given a sentence with a minimum and a maximum sentence. The maximum sentence is not determined by the trial judge but is set by law.  *See People v. Drohan,* 475 Mich. 140, 160-61, 715 N.W.2d 778, 789-90 (2006); *People v. Claypool,* 470 Mich. 715, 730 n.14, 684 N.W.2d 278, 286 n.14 (2004); MICH. COMP. LAWS § 769.8.  "[M]ichigan's sentencing guidelines, unlike the Washington guidelines at issue in *Blakely*, create a range within which the trial court must set the minimum sentence." *Drohan,* 475 Mich. at 161, 715 N.W.2d at 790.  Under Michigan law, only the minimum sentence must presumptively be set within the appropriate sentencing guidelines range. *See People v. Babcock,* 469 Mich. 247, 255 n.7, 666 N.W.2d 231, 236 n.7 (2003) (discussing MICH. COMP. LAWS § 769.34(2)).  Under Michigan law, the trial judge sets the minimum sentence, but can never exceed the maximum sentence. *See Claypool,* 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14.

*Blakely* is inapplicable here because *Blakely* is concerned only with the *maximum* penalty which is authorized by a jury's findings or a defendant's plea: if some additional factor increases the defendant's penalty beyond that which could be imposed solely on the basis of the jury's findings or the defendant's plea, *Blakely* requires that those facts be found by a jury beyond a

reasonable doubt (or be themselves pleaded to by a defendant).  As explained above, unlike the guidelines scheme at issue in *Blakely*, the Michigan sentence guidelines help determine only the minimum portion of a defendant's indeterminate sentence.  The maximum is, in every case, the statutory maximum authorized by law.  *See Claypool*, 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14; MICH. COMP. LAWS § 769.8. Petitioner's conviction on the CSC-I charge, therefore, contained all of the factual findings necessary to impose the statutory maximum (life imprisonment) on that charge.  *See Drohan*, 475 Mich. at 162, 715 N.W.2d at 790 ("Thus, the trial court's power to impose a sentence is always derived from the jury's verdict, because the 'maximum-minimum' sentence will always fall within the range authorized by the jury's verdict.").

This being the case, petitioner's sentence did not violate *Blakely* even though the trial court made additional factual findings in imposing the minimum term of petitioner's imprisonment, which in this case equated with his maximum term, life imprisonment.  The Supreme Court has repeatedly made clear that the *Apprendi* rule is concerned only with the maximum sentence which is authorized by a jury's verdict or a defendant's plea.  As the Supreme Court explained in *Harris v. United States*, 536 U.S. 545 (2002):

> *Apprendi* said that any fact extending the defendant's sentence beyond the maximum authorized by the jury's verdict would have been considered an element of an aggravated crime–and thus the domain of the jury–by those who framed the Bill of Rights.  The same cannot be said of a fact increasing the mandatory minimum (but not extending the sentence beyond the statutory maximum), for the jury's verdict authorized the judge to impose the minimum with or without the finding.

*Harris*, 536 U.S. at 557.  This distinction is important because the only issue under the Sixth Amendment is whether the judge is impinging on the role of the jury.  For this reason, the Court explicitly excepted indeterminate sentencing schemes such as Michigan's from its holding in *Blakely*.  Rejecting an argument raised by Justice O'Connor in dissent, the Court explained:

Justice O'Connor argues that, because determinate sentencing schemes involving judicial factfinding entail less judicial discretion than indeterminate schemes, the constitutionality of the latter implies the constitutionality of the former. This argument is flawed on a number of levels. First, the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury. Indeterminate sentencing does not do so. It increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty. Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence–and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned.

*Blakely*, 542 U.S. at 309 (citation omitted).

Under this reasoning, it is clear that Michigan's indeterminate sentencing guideline scheme, under which the maximum is established by statute and only the minimum term is based on judicial factfinding, does not violate the Sixth Amendment. *See Bellamy v. Curtin*, No. 1:06-CV-599, 2007 WL 527988, at *4 (W.D. Mich. Feb. 14, 2007); *Mays v. Trombley*, No. 2:06-CV-14043, 2006 WL 3104656, at *3 (E.D. Mich. Oct. 31, 2006) (Hood, J.); *Worley v. Palmer*, No. 2:06-CV-13467, 2006 WL 2347615, at *2 (E.D. Mich. Aug. 11, 2006) (Cohn, J.); *Toothman v. Davis*, No. 05-CV-74561, 2006 WL 2190515, at *2 (E.D. Mich. Aug. 1, 2006) (Edmunds, J.); *Drohan,* 475 Mich. at 164, 715 N.W.2d at 791-92; *Claypool*, 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.      NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc.  Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains.  Not later than ten days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.


s/Paul J. Komives_____
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 11/2/09

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record   by electronic means or U.S. Mail on November 2, 2009.

s/Eddrey Butts
Case Manager